Good morning, Your Honors. Sean Sherlock for the appellants. I would like to reserve three minutes time for rebuttal, and may it please the Court. The first issue I'd like to cover in my time here this morning is to address the District Court's conclusion that IGRA's plain language produces an absurd result. The District Court here reached its judgment only by concluding that IGRA's plain language, although clearly and unambiguously exempting state compacts from the Johnson Act and not exempting secretary procedures from the Johnson Act, nevertheless, the plain language cannot be enforced because to do so would produce an absurd result. My first point on this is that this is a quite extraordinary conclusion. When you consider all of the opinions of the various courts, the U.S. Supreme Court, this Court, the other Circuit Courts of Appeal, which have uniformly and repeatedly observed that IGRA's remedial scheme is carefully crafted and intricate, meticulously detailed, and finely tuned, our District Court really stands alone in concluding that the language produces an absurd result. And the standard, the legal standard here for whether or not the Court should depart from statutory language in the face of a purported absurd result is given to us by the U.S. Supreme Court's opinion in Tennessee Valley Authority v. Hill. In that case, the Court tells us that the Court should depart from the statute's plain text in the face of a purported absurd result only in rare and exceptional circumstances, and this is the important part, only when there is something to make plain the intent of Congress that the letter of the statute should not prevail. And here, of course, in this situation, we have nothing to make that plain. To the contrary, what we have in the legislative history points in the other direction, simply reaffirming the text of the statute. And here, the District Court, to reach its conclusion, really had to strain to interpret the statutory language quite narrowly in quite a cramped manner that created and produced its own internal inconsistencies and conflicts with other federal laws, rather than interpreting the language more naturally in a manner that would harmonize it both internally within itself and with other federal laws. And in so doing, the District Court's opinion produces its own absurd results. For example, under the District Court's opinion that the Secretary lacked any discretion to consider other federal laws may not consider other federal law in prescribing the procedures, we end up with a situation where a state and a tribe could collude, as they appear to have done here, to structure the procedures so that they can avoid federal laws. And according to the District Court's opinion, there is nothing that the federal government or the courts can do about that. Second example arises under IGRS Section 23. According to the District Court's opinion, in which the tribal-state compact is to be treated as the functional equivalent with secretarial procedures, then under Section 23, when the Secretary issues the procedures, the federal government would lose exclusive jurisdiction over the state's gambling laws, and the state would gain that jurisdiction back. And that is the exactly counterintuitive result when you consider that secretarial procedures are imposed upon the state by a federal officer after the state has declined or rejected its opportunity to regulate gaming under procedures. And so rather than just accept what the plain language of the statute tells us, which is that there is no exemption from the Johnson Act for gaming under secretarial procedures, we end up with this absurd and dangerous result whereby all of federal law can be trumped by a compact selected by a private mediator in a non-public proceeding behind closed doors from between a compact, one proposed by a tribe, one proposed by a state. You know, Section 2710 says that the Secretary shall prescribe procedures, quote, consistent with the proposed compact selected by the mediator. Isn't the use of the word compact significant here? The compact, I don't believe it is. I don't believe the argument turns on that, Your Honor, because to that point, when the mediator selects in the process, to that point, it is a compact because the tribe proposed a compact, the state proposed a compact, the mediator selected from one of those compacts. And still at that point, there is an opportunity for the state to consent to that compact for 60 days' time. When it doesn't, then it goes to the Secretary and it becomes the Secretary has to issue procedures. And so clearly, procedures are a different thing than a compact. Congress used a different name for them. Congress prescribed a different procedure for them. And substantively, they are quite different in a jurisdictional sense at a minimum. And so the second issue I'd like to address today is the issue of congressional intent. And with regard to any concern that not allowing slot machine gaming under secretarial procedures will somehow gut IGRA's remedial remedy contrary to Congress's intent, it's very important to remember that in 1988, when IGRA was enacted, slot machines were illegal in California and most other states except for Nevada and New Jersey. And so we know from this Court's opinion in Rumsey that, therefore, the states had no obligation to negotiate or allow slot machine gaming on tribal lands at that time. And so to prohibit slot machine gaming in tribal casinos in the year 2020 under secretarial procedures, we end up with a result that would be no different than it would have been following IGRA's adoption in 1988. And so we cannot say that there was any congressional intent that slot machine gaming should be allowed in tribal casinos. And the third point I'd like to make is with regard to the Indian canon of construction and explain why it is the Indian canon of construction does not apply in this case. And there are two cases I'd like to cite the Court to. The first is the Supreme Court's opinion in Chickasaw Nation v. United States. In Chickasaw Nation, Justice Breyer — well, the point being that the Indian canon is no trump card. Justice Breyer, writing for the Court's majority in that case, declined to apply the Indian canon, holding that other circumstances, evidencing congressional intent, can overcome the various canons of construction, including the Indian canon, and that the Indian canon is not inevitably stronger than the other canons of construction, especially when an interpretation of a congressional statute is at issue as opposed to an Indian treaty. And the second and more important point on the Indian canon is this Court's opinion in discretion to modify secretarial procedures, or a very narrow interpretation of the phrase consistent with, may favor the tribe in this case. It could work to the disadvantage of another tribe in a different case. And so we know from this Court's opinion in Redding Rancheria v. Jewell that the Indian canon is to be applied to construction or to the tribe in this case. And then the fourth and final point I would like to address this morning is why it is that NEPA's so-called rule of reason does not apply in this case to excuse the government from complying with NEPA and the Clean Air Act. And when you look at all of the various cases on this issue, the differentiating factor that distinguishes those cases in which NEPA is required from those cases in which NEPA is not required is whether there is some truly genuine irreconcilable conflict between the agency's duty under NEPA to apply NEPA to the fullest extent possible versus its mandate under the underlying substantive statute. And there are two cases from this circuit that I think are particularly applicable to our case. The first, San Luis and Delta-Mendota Water Authority v. Jewell. In that case, the question was whether or not the Bureau of Reclamation had to comply with NEPA before it implemented a biological opinion under the Endangered Species Act. The Natural Resources Defense Council argued that to require NEPA compliance would conflict with the Endangered Species Act and additional procedural requirements on the Bureau's efforts to protect endangered species. And this Court held, nevertheless, that the Bureau did need to comply with NEPA, holding, quote, the statute does not permit case-by-case exceptions that assess how NEPA interacts with the substantive statute at issue. That was this Court's opinion from 2014. And that is exactly what the district court did here. The next case would be Jones v. Gordon, which arose under the Marine Mammal Protection Act. In that case, despite a statutory timetable, a very strict statutory timetable requiring the agency to issue a permit within a given time, and despite the agency's own regulation that required that timetable to begin as soon as practical, this Court held, nevertheless, that because it was not impossible for the agency to comply with NEPA, citing the congressional mandate that NEPA apply, quote, unquote, to the fullest extent possible, and also citing congressional intent that the courts, quote, make as liberal an interpretation as they can to accommodate the application of NEPA. Now the other cases holding that NEPA does not apply, upon which the district court and my friends on the other side rely, namely Department of Transportation v. Public Citizen and the Alaska Wilderness League, those cases are different because in those cases the agency had no discretion other than to make an up-or-down binary decision, whether to grant or deny a permit or a plan, based on whether or not the applicant had met the statutory checklist of requirements. And the courts made clear that the agencies in those cases had no discretion to impose any further environmental requirements upon those permits or plans. Here, by contrast, we have a situation where there's nothing in AGRA that prevents the Secretary from complying with NEPA or the Clean Air Act, and there is no mandatory timeline, there is no sealing off of the Secretary's discretion to comply with these environmental laws, and to hold otherwise would create a that NEPA be applied to the fullest extent possible. If there are no questions, Your Honor, I'd like to reserve the remainder of my time. Thank you. You may. Thank you. Good morning, Your Honor. May it please the Court. My name is Rachel Heron on behalf of the Federal Appellees. For your Court's awareness, and if it's agreeable, I'll plan to use about nine minutes of the time that's available for questions.  The question before this Court is whether, under the Indian Gaming Regulatory Act, or IGRA, a state's refusal to negotiate in good faith with an Indian tribe condemns that tribe to conduct a lesser form of Class III gaming on Indian lands than that enjoyed by other tribes. Plaintiff Standup says, yes. Specifically, Standup argues that the Indian  that Class III gaming under secretarial procedures, which are a substitute for gaming under a tribal-state compact, is lesser than gaming under a literal tribal-state compact in two ways. First, that the scope of gaming under secretarial procedures is lesser because it cannot include slot machines. And second, because any Class III gaming authorized under secretarial procedures must be preceded by a time-consuming environmental analysis above and beyond the extensive environmental analysis that the Secretary already performed at the time it took this land into trust. Standup is wrong for two reasons. Standup is wrong on both counts. So, if it's agreeable to Your Honors, I'd like to start first with the scope of gaming question, the slot machines question. Standup presents this case as if it's a tradeoff between plain text versus some other policy goal. That is the wrong framework. This case is about plain text of a provision in a vacuum versus the text of a provision in the context of other text in the statute. To elaborate on that, everyone agrees that the remedial provisions of IGRA, which are the provisions that provide for the issuance of secretarial procedures, do not themselves contain any limitation on the types of Class III gaming, which is defined by statute to include slot machines, that may be conducted under secretarial procedures. To the contrary, the statute says that secretarial procedures must allow for Class III gaming without limiting language and further provides that that must be consistent with state law, IGRA, and a compact selected by a court-appointed mediator, which here included the use of slot machines. So, instead of relying on that provision, which is the most direct governing authority on what secretarial procedures do, where we would expect any limitation on what secretarial procedures can contain to occur, STANDUP instead looks at Section 2710d6 of the statute, which provides an express exemption from the Johnson Acts with regard to gaming conducted under a tribal state compact. Now, I will readily admit that if we were looking at that language in a vacuum, the most obvious reading would be that under a tribal state compact simply means under a literal tribal state compact. But when we look at that language in the context of the statute at large, we know that actually compact has a broader meaning. Specifically, Congress uses the phrase under a tribal state compact in IGRA to refer to both gaming that is conducted under a literal compact or, or rather, and gaming that is conducted under the secretarial procedure substitute to a compact. I think the clearest place that we can see that usage is in Section 2710d1 of the statute, which says, and I'm quoting, Class III gaming shall be lawful on Indian lands only if such activities are, ellipsis, conducted in conformance with a tribal state compact. Now, given that we know that Section 2710d7 authorizes Class III gaming under secretarial procedures as well, that statement in 2710d1 cannot be correct, cannot be true unless we understand the reference to gaming under a compact to mean gaming under a compact or under the sanctioned substitute for a compact. I'd like to ask you a question regarding the environmental claims. Certainly, Your Honor. Happy to turn there. It appears you argue that nothing in IGRA gives the Secretary the authority to consider alternatives to the mediator-selected compact. Do you concede that NEPA generally requires more than just a consideration of proposal alternatives? I'm sorry, Your Honor. I'm not quite sure. I guess I'm just trying to figure out why is it, or is it your position that IGRA does not compact or mitigation of its adverse impacts? Yes, so I would phrase it this way. We think that IGRA does not provide the Secretary sufficient discretion to alter the environmental effects of the mediator-selected compact terms to give rise to a requirement to conduct a NEPA analysis under the standard that's been set forth in public citizen. So I guess, does that mean then in prescribing these special procedures that the Secretary is permitted to modify a mediator-selected compact that could violate federal law? So I am not saying, and this Court need not decide, that the Secretary has no ability to deviate from the terms that were selected by the mediator for any reason. The question is whether whatever amount of discretion the Secretary has extends to including environmental conditions that were not part of one of the selected compacts. And to understand why the Secretary does not have that kind of discretion, I think we again need to look at the context. As we've said, secretarial procedures are a substitute for a tribal-state compact, and they're a substitute that occurs not when the tribe has done anything wrong, but when a court has found that a state did not meet its statutory obligation to negotiate in good faith with the tribe. In a circumstance where the state does negotiate in good faith and where a tribal-state compact is reached, there is no dispute that the Secretary of the Interior does not have an opportunity in that process to alter the terms that were selected in order to account for environmental concerns. To nonetheless find that in the secretarial procedures context, the Secretary has the discretion to alter the terms of the mediator-selected compact in order to avoid various environmental concerns would create a disparate burden on tribes that are required to resort to the secretarial procedures as a result of a state's intransigence. And what's the authority for that? I think that's inherent in the way that we in the statute. There's no question that it would create a different burden in the secretarial procedures context than in the compact context. So I think... Well, in the compact context, NEPA would apply, but in the secretarial procedures, NEPA would not apply? No, Your Honor. Let me be clear. There is no NEPA analysis in the compact process. In the situation where a compact is entered into, there is no NEPA that must be done. Our view is that in order for this to be a true substitute for a compact, the same should be true of secretarial procedures, at least in the absence of some text that clearly indicates the contrary. Here there is no such text that indicates the contrary because we have the language regarding what the secretary must do when it's issuing secretarial procedures. First, puts the court-appointed mediator in the driver's seat, not the secretary. It could have designed a process where the secretary gets all sorts of, you know, free-flowing discretion on what the material inside these procedures would be, but it's not what they chose. And second, because there is a list of things that the secretary is to consider when it is putting the secretarial procedures in place, and NEPA and environmental concerns are not listed. I think that omission in the context of a situation where we would be setting up a disparate burden on tribes that must do a compact versus secretarial procedures shows you that there's no such discretion here. I would like to yield the remainder of the time unless the court has another question for the United States. Thank you. May it please the court, Danielle Spinelli for North Fork. I'd like to start by picking up on the question about NEPA that the court asked the United States. I think it's critical to understand that there was an environmental impact statement prepared and a Clean Air Act conformity determination prepared at the appropriate time in this process, at the time when the secretary actually had discretion over whether or not North Fork's gaming project would go forward and over the scope and shape of that gaming project. That was when the secretary issued its two-part determination concluding that a gaming project would be in the best interest of the tribe and not detrimental to the surrounding community. It generated a 900-page environmental impact statement. The process took several years. It listed pages and pages of mitigation measures that North Fork was required to undertake, and it concluded that with those mitigation measures, it was appropriate to approve North Fork's gaming project. The secretarial procedures are not the same thing. Standup challenged the sufficiency of the environmental impact statement and the conformity determination in the district court for the District of Columbia. So you're saying the environmental review occurred when the land was taken in trust? It occurred, Your Honor, in conjunction with the two prior agency actions that are relevant in this case. First, the secretary made a two-part determination under IGRA concluding that gaming on North Fork's Madeira property would be in the best interest of the tribe and not detrimental to the surrounding community. That included a full NEPA process and environmental impact statement. And that process was also relied on when the secretary issued its trust determination, taking the Madeira parcel into trust for North Fork. So when Standup calls the secretarial procedures the approval of a gaming project, that's not accurate. That approval happened through the two-part determination process. So does it matter that the secretary is not involved in negotiating the compact between the tribe and the state? Well, no. In this case, it doesn't matter. The point is that there was a full environmental impact analysis conducted during when the two-part determination was made. The state's governor then concurred in the two-part determination. So the state has not challenged the sufficiency of the environmental analysis. The state is not challenging the secretarial procedures, as you observed in the previous case. The state is not here. We have a private interest group purporting to assert the state's interests. And so would it be appropriate or why wouldn't it be appropriate for the secretary to supplement the prior environmental review? There wasn't a need to do so. The project is the same. So the secretarial procedures specifically incorporate all the mitigation measures in the environmental impact statement and say that the tribe has to abide by those procedures. And the project is the same project that was approved through that earlier NEPA process. If there had been a need to do so, could it have been done to supplement the review? I don't believe the secretary has the discretion when issuing secretarial procedures to undertake that kind of environmental review for the reason that the United States explained. Secretarial procedures are a substitute for a compact. They're designed to be as close as possible to what the state and the tribe would have agreed on had they reached agreement. And in this case, the state and the tribe each submitted compacts to the mediator that were virtually identical, and the secretarial procedures are consistent with that. When the secretary approves a compact, no one has ever suggested that the secretary needs to go through NEPA procedures, and secretarial procedures are no different. But in any event, I think the point is that when the secretary did have the discretion over this project to consider whether environmental impacts meant it shouldn't go forward at all or should only go forward in some different form, the secretary undertook that analysis, and the sufficiency of that analysis was affirmed by the district court and the D.C. Circuit. Do we have a sense of how much additional time it would take to go through the environmental analysis or the conformity review? My understanding is that the idea here is that this process should move pretty expeditiously. That's absolutely right, Your Honor. And the original NEPA process took several years, and the tribe has been trying to get this project off the ground now for 15 years. It's been in litigation for a very long time, and it doesn't make any sense either from a NEPA perspective or from an IGRA perspective to require the secretary to undergo this same lengthy procedure again simply because California did not execute a compact with North Fork. May I say a word about IGRA or — Just briefly, you're down beyond your time, so I'll give you one minute. Okay. Thank you, Your Honor. I just want to make one point, which is this Court has several decisions that discuss in detail the remedial provisions of IGRA. Rincon Band is one. Spokane is one. The Indian gaming cases are another. All of those are cited in our briefs. And what those cases say is that IGRA created the compact mechanism to give states a voice regarding gaming on tribal lands but not to give it a veto. If a state doesn't negotiate in good faith with a tribe over any form of Class III gaming that's offered in the state, then the secretary can intervene to impose a gaming arrangement without the affected state's approval. That's Rincon Band. Here, no one disputed that California was obligated to negotiate with North Fork over Class III gaming devices. California has decided to allow slot machines. And what IGRA says is that once the state has made that decision, it has to negotiate on a level playing field with everyone, with all the tribes. And indeed, the state and the tribe both proposed identical compacts to the mediator, both of which were centered on the use of gaming devices. And in order for secretarial procedures that didn't allow North Fork to operate Class III gaming devices wouldn't have satisfied either requirement for secretarial procedures. They wouldn't have allowed Class III gaming, which is a defined term in IGRA that includes gaming devices, to be conducted, nor would they have been consistent with the mediator-selected compact, and they wouldn't have provided North Fork with the remedy it was entitled to. Thank you. Thank you. Unless — Judge Gould, do you have any other questions? No? No questions. Thank you. I think you have three minutes left for your rebuttal, but I'll give you an extra minute if you need it. Thank you, Your Honor. I don't think I will need it. With regard to my friend's comment about the EIR having been prepared at an earlier stage, and it's true, there was an EIR prepared at an earlier stage, but it was not for the same project. The project is different now under the secretarial procedures. The comment that the project is the same is simply not true. The project that was approved, and we've covered this in our brief, the project that was approved under the prior fee-to-trust determination and the IGRA gaming determination was a 68,000-square-foot casino floor in a single casino with 2,000 slot machines. But now under the secretarial procedures, we have up to two casinos with up to 2,500 slot machines and unlimited size of casino gaming floor. And so the project is very much different. The other thing I would point out on this issue is that there was no reliance by the Secretary on that prior EIS under NEPA. In fact, in addition to the statement in the approval letter stating that these secretarial procedures are separate from the Secretary's prior determinations, we don't have the prior EIS in the administrative record in this case, demonstrating that there was no effort or intent by the Secretary to rely on that prior EIS or on the prior conformity determination. Won't this, if you need a new EIS or conformity analysis, won't this extend the time for getting this matter off the ground by years? I mean, Congress seemed to express intent that this procedure move pretty quickly. And this seems like it would really slow things down. Not for years, certainly, Your Honor. This Court confronted that question. I believe in perhaps the Rincon case, in which it concluded that 120 days is the statutory or at least the regulatory time frame for preparation of an EIS. That would be the minimum amount of time. And granted, they can take longer than 120 days. But there's no reason to believe it would be years, particularly where they already have a foundation to work from with the prior EIS. And, in fact, I would also point out that the Department of the Interior has its own NEPA regulations at 43 CFR Part 46, and specifically Section 46.120, which guide the agency when it is going to approve a project that is different from, you know, that varies from a project analyzed under a prior EIS. And so does this happen routinely in other special or where other special procedures are used? Your Honor, I'm not sure that it has. In fact, Your Honor asked the case or the question earlier about how many times have these procedures been issued. In the record that we have in this case, we know of, I think, only three instances, the Northern Arapaho, the Mashantucket Pequot, and the Rincon. And I would point out that at least in two of those cases, the Northern Arapaho and Mashantucket Pequot procedures, the Secretary, contrary to the position they take in this lawsuit, saying the Secretary has no discretion to modify procedures, the Secretary did, in fact, modify procedures in those cases as well as in this case. And in those cases, if you know, was it dramatically different in terms of the modification? I'm sorry, Your Honor, I don't know the history behind all of those details with those particular procedures. And whether or not NEPA was complied, even if it was not, just because the Secretary may have not complied with the law in two or three prior instances over the last 30 years seems to me a poor reason to give that practice the force of law and overcome NEPA. If there are no further questions, thank you, Your Honor. Thank you very much. Thank you all for your presentations here this morning. Really appreciate the oral arguments. So the case of stand-up for California v. U.S. Department of the Interior is now submitted. And unless the school, do you want a break, or shall we proceed with the last two cases? Is it Hale and Verducci? Yes. I think I would like a 10-minute break. That would be fine. So we'll be in a brief recess for 10 minutes, and then we'll resume with the next case of Beverly Hill v. Bay System, San Francisco. Thank you.
judges: Rawlinson, Callahan, Bolton